# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-080-RMR-3

UNITED STATES OF AMERICA,

     Plaintiff,

v.

3.  MARIA DAVIS-CONCHIE,
     a/k/a "CeCe,"

     Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Peter McNeilly, Assistant United States Attorney for the District of Colorado, and the defendant, Maria Davis-Conchie, personally and by counsel, John F. Sullivan, III, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

## I.    AGREEMENT

### A. Defendant's Plea of Guilty:

The defendant agrees to

(1)    Waive indictment and plead guilty to an Information charging a violation of 21 U.S.C. §§ 841(a)(1), 841(b)(2), and 859, Distribution of Alprazolam, a Schedule IV Controlled Substance, to Persons Under Twenty-One Years of Age;

(2)    Waive certain appellate and collateral attack rights, as explained in detail below; and

COURT EXHIBIT
1

(3)    Not contest forfeiture as more fully described below.

**B. Government's Obligations:**

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A). The government agrees to move to dismiss the Superseding Indictment as to the defendant with prejudice.

Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement and potentially file another superseding indictment. The parties understand that any portions of this agreement pertaining to the recommendations of the parties are not binding on the Court.

Provided the defendant does not engage in prohibited conduct or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b).

**C. Defendant's Waiver of Appeal:**

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

(1)     the sentence exceeds the maximum sentence provided in the statute of conviction, 21 U.S.C. §§ 841(a)(1), 841(b)(2), and 859;

(2)     the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of 25; or

(3)     the government appeals the sentence imposed.

If the first criteria applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence. But if one of the latter two criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1)     the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2)     the defendant was deprived of the effective assistance of counsel; or

(3)     the defendant was prejudiced by prosecutorial misconduct.

The defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings. In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

**D. Forfeiture of assets**:

The defendant admits the forfeiture allegations. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 21 U.S.C. § 853, whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere. The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. The defendant understands that, pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters. Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives his rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to him if notice is not sent within the prescribed time frames. The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

## II.   ELEMENTS OF THE OFFENSE

The parties agree the elements of a violation of 21 U.S.C. §§ 841(a)(1), 841(b)(2), and 859, as charged in the Information, are as follows:

*First:* The defendant knowingly or intentionally distributed a controlled substance as charged, to Juvenile #1;

*Second:* The substance was in fact alprazolam, a Schedule IV controlled substance;

*Third:* The defendant was at least eighteen years of age; and

*Fourth:* Juvenile #1 was under twenty-one years of age.

## III.   STATUTORY SENTENCE

The statutory sentence for a violation of 21 U.S.C. §§ 841(a)(1), 841(b)(2), and 859, as charged in the Information, is: not less than 1 year and not more than 10 years imprisonment; not more than a $500,000 fine; not less than 2 years and not 3 years of supervised release; and a $100 mandatory victim's fund assessment fee.

## IV.   COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V.    STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree the government would be able to prove the following facts at trial.


*Distribution of Alprazolam and LSD to Juvenile #1 and His Friends*

On a regular basis over the course of at least one year leading up to January 30, 2022, the defendant illegally distributed controlled substances to her teenage son (Juvenile #1) and his teenage friends. The defendant repeatedly sold the kids alprazolam (Xanax), a Schedule IV controlled substance. The defendant provided Juvenile #1 and his friends with Xanax for $5 to $10 per pill and gave them cautionary instructions to not use too many of the pills at one time. For some period of time, Juvenile #1 and Juvenile #3 used Xanax every weekend, although some of the Xanax was from people other than the defendant.

The defendant assumed her son would do drugs no matter what, so she decided to sell him and his friends drugs she felt were "safe." In addition to Xanax, the defendant also provided the boys with marijuana, marijuana concentrate, and acid (LSD). Around December 31, 2021, the defendant purchased Xanax bars and acid (LSD) for her son and his friends. The defendant acquired these drugs and gave them to the boys because Juvenile #1 and his friends wanted to try something different on New Years Eve, and the defendant believed psychedelic drugs like LSD were "safe." The defendant claims she bought those drugs from McGuire at a fire station near McGuire's residence and she brought Juvenile #1 and two of his friends (Juvenile #2 and Juvenile #3) with her.

The defendant knowingly and intentionally distributed controlled substances to Juvenile #1, including alprazolam, a Schedule IV controlled substance. The defendant was at least eighteen years of age when she distributed the controlled substances to Juvenile #1. Juvenile #1 was under twenty-one years of age.

*Death of Juvenile #1 on January 31, 2022*

On January 31, 2022, members of the Colorado Springs Police Department (CSPD) and emergency medical services were called to an address in Colorado Springs, Colorado, on the report of an unresponsive male. First responders found Juvenile #1 dead in his bedroom at his father's and stepmother's home.

CSPD officers searched Juvenile #1's room and located a small plastic baggie containing two blue pills. The blue pills had the markings "M" and "30" on them. These pills were submitted the Drug Enforcement Administration (DEA) Western Laboratory for

formal analysis. The lab concluded both pills contained para-fluorofentanyl. One of the two pills also contained fentanyl, acetaminophen, lidocaine, and xylazine.

The El Paso County Coroner's Office performed an autopsy on Juvenile #1. The resulting autopsy report offered the following opinion: "Based on the history, scene investigation, autopsy, and toxicology findings, it is my opinion that [Juvenile #1], a 16-year-old white male, died as a result of acute fentanyl and para-fluorofentanyl toxicity."

Through interviews with family members and consent searches of electronic devices, officers identified Juvenile #2 (YOB: 2005) and Juvenile #3 (YOB: 2006) as close friends of Juvenile #1. Indeed, Juvenile #2 and Juvenile #3 were with Juvenile #1 on the evening of January 30, 2022, before he died.

*Interview with Juvenile #2*

On February 11, 2022, Juvenile #2 participated in a forensic interview with the FBI. Juvenile #2 explained he, Juvenile #1, and Juvenile #3 were all friends. Juvenile #2 met Juvenile #1 and Juvenile #3 through mutual friends even though they went to different schools. Juvenile #2, Juvenile #1, and Juvenile #3 used drugs together on the weekends. They have experimented with marijuana, ecstasy, and recently began to smoke what Juvenile #2 described as Percocet pills.

According to Juvenile #2, Juvenile #1 provided the Percocet pills for himself and his friends to smoke. Juvenile #2 knew Juvenile #1 acquired the pills through a connection with Juvenile #1's mother, the defendant. Juvenile #1 had known Doug Floyd for several years prior to the narcotics transactions, as Floyd was a friend of the defendant. Juvenile #2 explained the defendant had given and/or sold Juvenile #1,

Juvenile #2, and Juvenile #3 other drugs in the past, and the defendant knew drug dealers by the names of Marlene and Doug. Juvenile #2 said the defendant eventually introduced Juvenile #1 to Marlene and Doug, and Juvenile #1 purchased pills with Juvenile #2 and Juvenile #3 from both Marlene and Doug multiple times over the several months prior to Juvenile #1's death. Juvenile #1 communicated with Doug or Marlene on Juvenile #2's cellular telephone, and Doug would sell one pill for $10. Juvenile #2 was able to describe Doug as an older white male with a beard and ear piercings who drove an older white pickup truck.

The interviewer showed Juvenile #2 a photograph of Douglas Floyd with no identifying information, and Juvenile #2 positively identified the defendant as the "Doug" who sold Juvenile #1 the blue pills. The interviewer showed Juvenile #2 a photograph of the defendant with no identifying information, and Juvenile #2 positively identified the person in the photo as Juvenile #1's mother. The interviewer also showed Juvenile #2 a photograph of Marlene McGuire with no identifying information, but he could not positively identify her. He provided the name of "Marlene" in an uncertain voice and stated he believed the photo he was shown was of her.

Juvenile #2 explained that, on January 30, 2022, Juvenile #2, Juvenile #1, and Juvenile #3 traveled to a fire station to purchase four Percocet pills from Doug for $40. Juvenile #1 had arranged for the transaction using Juvenile #2's cell phone. When the boys arrived at the fire station, Juvenile #1 got out of the vehicle and exchanged cash for the pills. When Juvenile #1 got back in the car, he had a small plastic baggie with four blue pills in it. Juvenile #2 stated multiple times during the interview that the defendant had nothing to do with the fentanyl sale on January 30, 2022.

Juvenile #2, Juvenile #1, and Juvenile #3 used one of the pills together. Juvenile #2 drove Juvenile #1 back to his residence and dropped him off. Juvenile #1 had the small plastic baggie with three remaining blue pills in it. The interviewer showed Juvenile #2 a photograph of the two pills in a plastic baggie recovered from Juvenile #1's room. Juvenile #2 said the pills in the picture were the "percs" they purchased from Doug and/or Marlene.

*Interview with Juvenile #3*

On February 11, 2022, Juvenile #3 also conducted a forensic interview with the FBI. Juvenile #3 said he had known Juvenile #1 since the 6th grade and considered him a good friend. They had previously gotten in trouble together for smoking marijuana when they were about 13 years old.

Juvenile #3 was familiar with Juvenile #1's mother, the defendant. Juvenile #3 said Juvenile #1 was embarrassed about his mother's prior criminal history and had originally told Juvenile #3 the defendant was his aunt. Juvenile #1 eventually told Juvenile #3 the truth about the defendant and, after she was released from jail, she wanted to get back into Juvenile #1's life.

Juvenile #3 said Juvenile #1 started using drugs with the defendant some time ago. According to Juvenile #3, the defendant provided Juvenile #1 and Juvenile #3 with Xanax and gave them cautionary instructions to not use too many of them. For some period, Juvenile #1 and Juvenile #3 used Xanax every weekend.

Juvenile #3 recalled an incident approximately one year before the interview when he overdosed on Xanax and had to be taken to the hospital. Juvenile #3 told

Page 10 of 29

investigators the defendant had given him the Xanax. The complete circumstances of this incident have not been fully investigated. Juvenile #3 said the defendant sold the boys Xanax pills for $7 per pill. Juvenile #3 said the defendant had several dealers who would come to her apartment to deliver the drugs. Juvenile #3 also said one of the dealers was a male named Doug, who Juvenile #3 described as a white male in his 40s to 50s with a goatee, white hair, and piercings.

The interviewer showed Juvenile #3 a photograph of Douglas Floyd with no identifying information, and Juvenile #3 positively identified the defendant as "Doug." The interviewer showed Juvenile #3 a photograph of the defendant without any identifying information, and Juvenile #3 positively identified her. The interviewer also showed Juvenile #3 a photograph of Marlene McGuire without any identifying information, and Juvenile #3 positively identified her.

Juvenile #3 explained Juvenile #1 got the idea of smoking Percocets from school, and asked the defendant if she could get any for them. Juvenile #1, Juvenile #2, and Juvenile #3 smoked Percocet for the first time at Juvenile #2's house. After the second time they used Percocet, Juvenile #1 told Juvenile #3 the pills were fake and they were actually fentanyl. Juvenile #2 believed the defendant told Juvenile #1 they were fake pills.

Juvenile #2, Juvenile #1, and Juvenile #3 would buy the pills at night down south. Juvenile #2 said Juvenile #1 would text Marlene on Juvenile #2's phone to arrange the transaction. Marlene would tell them when and where to meet, and they would drive to meet her. Juvenile #1 would get out of the car and get the pills from Marlene and then get back in the car. The pills were in clear plastic bags. Sometimes, the shades of blue

were different, and they looked like they were going to fall apart. Sometimes, they would text Marlene and then Doug would show up to deliver the pills.

On January 30, 2022, Juvenile #3 went over to Juvenile #2's house. Juvenile #3 believed the defendant sent Juvenile #1 $40 earlier through a Cash App on Juvenile #2's phone. Juvenile #1 sent messages to Marlene and/or Doug and, around 6:00 p.m. or 7:00 p.m., Marlene texted back and instructed them to go to the same spot they normally go. When they arrived at the location, Juvenile #1 got out of the car and went to the passenger window of Doug's vehicle and picked up the four pills. The three boys went to Juvenile #2's house to smoke one of the pills. Juvenile #2 and Juvenile #3 then dropped Juvenile #1 off at his dad's house, and Juvenile #1 had the remaining three pills. Juvenile #2 and Juvenile #3 told Juvenile #1 not to use any more pills and he said he wouldn't use the pills without Juvenile #2 and Juvenile #3. One of the pills was a lighter shade of blue and maybe had a little yellow coloring to it.

Juvenile #3 was shown a photograph of the pills recovered from Juvenile #1's room and acknowledged those were the pills they purchased from Doug and/or Marlene, but the pill that had a little yellow coloring to it was gone.

*Review of Juvenile #3's Cell Phone*

Agents located text messages on Juvenile #3's phone which were between Juvenile #3's phone and a contact named "CeCe." Based on the content in those messages, it appears Juvenile #1 was using Juvenile #3's phone to communicate with Juvenile #1's mother, the defendant.

The following messages took place on or about January 3, 2022, between Juvenile #3's phone and (719) 504-2038, which was named "CeCe" in Juvenile #3's contact list. There were other messages that occurred in between some of the messages below, but they have been omitted for readability and do not tend to change the meaning of the conversations.

| Sender/Receiver | Message Text |
|---|---|
| From Juvenile #3's Phone to CeCe | "May I just get her number mom please" |
| From Juvenile #3's Phone to CeCe | "Or Doug's cuz u have me the wrong number" |
| From Juvenile #3's Phone to CeCe | "That's all We need" |
| From CeCe to Juvenile #3's Phone | "if and when she texts me back I will stop everything I'm doing and ask her if she can meet you. I'm in Boulder tonight so I doubt she will meet you son" |
| From Juvenile #3's Phone to CeCe | "No your good I just wanna see if I could just go to her myself since she seen me in the car" |
| From Juvenile #3's Phone to CeCe | "Just ask if I'm aloud to get her number and buy sum off her whenever you can possibly go home rest you been working but if you could do that it would be great" |
| From Juvenile #3's Phone to CeCe | "Did you happen to get ahold of m?" |
| From Juvenile #3's Phone to CeCe | "Were doing it rn... 40 bucks ... And we need 4 ..." |
| From CeCe to Juvenile #3's Phone | "...he said he will do 5 for 40 ... THOSE ARE MY PRICES ONLY ... from him ... BUT I Need gas money to drive them all the way to you guys" |
| From Juvenile #3's Phone to CeCe | "That's even better" |
| From CeCe to Juvenile #3's Phone | "yeah NO SHIT SHERLICK" |

*Review of Juvenile #2's Cell Phone*

Juvenile #2 deleted most of the text message and call data from his cell phone before providing it to law enforcement. Investigators were able to recover some text message content, specifically related to communications with the defendant's phone. It appears Juvenile #1 was primarily communicating with the defendant via Juvenile #2's phone. For example, some of the messages referred to the defendant as "mom."

On or about January 3, 2022, the defendant sent a text to Juvenile #2's phone which said, "719-517-6080," followed by "…that's Dougs number now leave me alone I'm driving and I'm stressed out son. I love you." (719) 517-6080 was indeed the Floyd's phone number at the time of the text message and throughout this investigation.

On or about January 11, 2022, the following text conversation took place:

| Sender/Receiver | Message Text |
|---|---|
| Sent from Juvenile #2's Phone to CeCe's Phone | "Can u get ahold of doug ?" |
| Sent from CeCe's Phone to Juvenile #2's Phone | "I'll try" |
| Sent from Juvenile #2's Phone to CeCe's Phone | "Okay thanks" |
| Sent from Juvenile #2's Phone to CeCe's Phone | "Appreciate it and just tell him to call my number if you do" |
| Sent from Juvenile #2's Phone to CeCe's Phone | "Did you get ahold of him ?" |

On or about January 21, 2022, Juvenile #1 sent a text from Juvenile #2's phone to the defendant that read, "…Can't you cashapp us like a little money…. I'm sorry I've just had a shitty ass day I wanna get high…" The defendant replied, "…sorry baby I won't have any money until Monday."

Agents recovered location data from Juvenile #2's phone, and investigators were able to map the location of the phone on January 30, 2021. The location data shows

that Juvenile #2's phone traveled to a fire station located at 5110 Bradley Circle, Colorado Springs, Colorado, at approximately 7:17 p.m. and left at approximately 7:24 p.m. This information tends to support Juvenile #2's and Juvenile #3's statements about when and where Juvenile #1, Juvenile #2, and Juvenile #3 purchased pills on January 30, 2022. Investigators also obtained location information from Juvenile #3's phone which shows the phone went to similar locations, indicating the boys were together as they described.

Investigators determined McGuire and Floyd lived at 4492 Excursion Drive, Colorado Springs, Colorado. 4492 Excursion Drive was approximately .7 miles from the fire station at 5110 Bradley Circle.

*Text Messages from TextNow*

In addition to using the text messaging function on her phone, McGuire used a third-party application called TextNow to communicate with narcotics customers, including Juvenile #1. On March 29, 2022, investigators served a search warrant on TextNow for information related to the account which used phone number (719) 245-0803—one of several numbers McGuire used. TextNow provided data which included the following text messages between McGuire and Juvenile #2's phone. The content of the messages and the name of the contact in McGuire's TextNow application establishes Juvenile #1 was actually the person using Juvenile #2's phone.

| Date | Sent/Received by McGuire | Message |
|------|--------------------------|---------|
| 2022-01-19 02:11:13 UTC | Sent | What's up |

| | | |
|---|---|---|
| 2022-01-19 02:12:52 UTC | Sent | It's M |
| 2022-01-19 02:13:45 UTC | Received | Hey this is cece son, I fronted doug money for 2 bls and he gave me your number and told me to go through you |
| 2022-01-19 02:15:05 UTC | Received | He said that he would tell you and all that idk  did he tell you ? |
| 2022-01-19 02:15:50 UTC | Sent | I'm sorry about Doug his bad w money. I can do 16 for 2 this time cuz he messed up w u |
| 2022-01-19 02:16:52 UTC | Sent | And I told him he still owes me 50 for the ones I gave him the day B4. |
| 2022-01-19 02:16:53 UTC | Received | Okay that would be awesome I have 20 for you |
| 2022-01-19 02:17:13 UTC | Sent | K |
| 2022-01-19 02:17:29 UTC | Received | Yeah I had just given him 30 in cash and I hit him up for them and he said just go to you |
| 2022-01-19 02:17:34 UTC | Received | Where would I like to meet |
| 2022-01-19 02:17:52 UTC | Sent | U can meet me at forestation Bradley n alturas |
| 2022-01-19 02:18:26 UTC | Received | Okay sounds good will be heading there in 5 |
| 2022-01-19 02:18:49 UTC | Sent | K |
| 2022-01-19 02:18:50 UTC | Received | 22 mins out |
| 2022-01-19 02:18:57 UTC | Sent | K |
| 2022-01-19 02:36:52 UTC | Received | 10 mins out |
| 2022-01-19 02:39:11 UTC | Sent | K |
| 2022-01-19 02:44:54 UTC | Received | Here |
| 2022-01-19 02:51:29 UTC | Sent | K |

| 2022-01-19 02:55:21 UTC | Sent | Is that you in the white car |
|---|---|---|
| 2022-01-19 02:55:41 UTC | Received | No on the side of the firehouse, blue suv |
| 2022-01-19 02:56:30 UTC | Sent | Follow me |
| 2022-01-19 02:57:01 UTC | Received | Okay |
| 2022-01-19 02:57:05 UTC | Received | Is this u up ahead |
| 2022-01-19 02:57:13 UTC | Sent | Yes |
| 2022-01-19 02:57:54 UTC | Received | Do u want me to get in |
| 2022-01-19 02:58:16 UTC | Sent | Come up to my passenger side |
| 2022-01-19 02:59:32 UTC | Sent | Sorry I had to reuse one of my other bags so it's not a clean bag |
| 2022-01-19 03:00:05 UTC | Sent | And please be careful sometimes they're not consistent one may be stronger than the other |
| 2022-01-19 03:00:48 UTC | Sent | And only do it if you got a narcan somewhere I don't really feel comfortable with somebody so young |
| 2022-01-19 03:00:49 UTC | Received | Yes will do have noticed that with them |
| 2022-01-19 03:02:08 UTC | Received | Yes mam I have one in my med kit but I will make sure to go easy on them I only take 2-3 hits at a time. |
| 2022-01-19 03:03:03 UTC | Sent | K. I heard of people just taking one and oding so please be careful. |
| 2022-01-19 03:05:00 UTC | Received | Yes I will make sure to, have a nice nite |
| 2022-01-19 03:07:27 UTC | Sent | You too |
| 2022-01-19 23:59:53 UTC | Received | Hey M would u be willing to meet me for 2 bls ? |
| 2022-01-20 00:11:58 UTC | Sent | Firehouse |

| 2022-01-20 00:13:20 UTC | Received | Okay cool im otw now |
|---|---|---|
| 2022-01-20 00:13:31 UTC | Received | 20 for 2 correct? |
| 2022-01-20 00:35:54 UTC | Received | 10 mins out |
| 2022-01-20 00:42:30 UTC | Received | Pulling up |
| 2022-01-20 00:49:40 UTC | Received | Here |
| 2022-01-20 00:54:48 UTC | Received | Hello ? |
| 2022-01-20 00:57:07 UTC | Sent | I know he owes you but I'm seeing him for me cuz I'm really busy can you give me 20 minutes he's a piece of s***ass up |
| 2022-01-20 00:57:33 UTC | Sent | I'm so sorry I don't know what the rest of that text is but anyway I got to send Doug some really busy |
| 2022-01-20 00:59:24 UTC | Received | Yes that's okay I'm sorry he's acting like that, I'm here at the fire station I will wait for you just lmk when ur otw |
| 2022-01-20 01:01:08 UTC | Sent | He's on his way |
| 2022-01-20 01:01:56 UTC | Received | Oh is doug serving us ? |
| 2022-01-20 01:02:05 UTC | Sent | Yes |
| 2022-01-20 01:02:12 UTC | Received | Alright we are in blue suv on the side |
| 2022-01-20 01:02:19 UTC | Sent | K |
| 2022-01-20 01:03:31 UTC | Received | Okay cool |
| 2022-01-20 01:12:13 UTC | Received | Thank you m have a good nite sorry about Doug |
| 2022-01-20 02:22:23 UTC | Sent | It's all good |
| 2022-01-21 23:18:06 UTC | Received | Hey M, Doug was telling me to hit you up for the 2 that he owes me and I told him I didn't wanna bother you with that but he |

| | | said he would pay you for them but if u don't feel like dealing wit that I totally understand I can try to get sum cash to buy sum instead of you having to pay his debt so if not I totally get it |
| --- | --- | --- |
| 2022-01-21 23:27:26 UTC | Sent | Yeah if I were to cover Doug's debts every time he screws up I wouldn't be in business |
| 2022-01-21 23:29:29 UTC | Received | No that's fine I totally understand you I'll try to get sum cash tho I'll hyu if so |
| 2022-01-21 23:29:42 UTC | Sent | K |
| 2022-01-22 17:43:06 UTC | Received | Hey M ,will u meet me for 2 of the bluz |
| 2022-01-22 23:59:41 UTC | Sent | You'll have to contact Doug I don't have the ability put myself out there for two. if you can save up and do it once a week or save up for every other week I can take care of you, but for something like this you have to keep contact him. :/ |
| 2022-01-23 06:44:33 UTC | Sent | Did Doug meet you |
| 2022-01-23 18:13:07 UTC | Received | No he didn't it's okay tho |
| 2022-01-23 19:58:22 UTC | Sent | I gave him some |
| 2022-01-23 20:16:16 UTC | Received | https://media.textnow.com/?h=51987f16-7c89-11ec-bcf0-ae1c00bf592b |
| 2022-01-23 20:16:19 UTC | Received | Yeah he won't answer smh |
| 2022-01-23 20:16:36 UTC | Received | That's the last thing he said and now he won't answer me |
| 2022-01-23 20:37:55 UTC | Sent | I'm hm if he doesnt |
| 2022-01-23 20:41:44 UTC | Received | Hm? |
| 2022-01-23 20:41:56 UTC | Sent | I'm home |
| 2022-01-23 20:48:37 UTC | Received | Okay will you meet me one more time for just whatever 20 can get me then ? And |

| | | then I'll make sure to come with like 60 or more next time |
|---|---|---|
| 2022-01-23 20:48:51 UTC | Sent | Yes |
| 2022-01-23 20:48:56 UTC | Sent | Ok |
| 2022-01-23 20:49:04 UTC | Received | Okay fire station? |
| 2022-01-23 20:50:00 UTC | Sent | Yes |
| 2022-01-23 20:52:36 UTC | Received | Okay I'm otw |
| 2022-01-23 20:52:43 UTC | Sent | K |
| 2022-01-23 20:53:00 UTC | Sent | Keep this btw us |
| 2022-01-23 20:54:33 UTC | Received | Yes ofc |
| 2022-01-23 21:16:52 UTC | Received | 2 mins out |
| 2022-01-23 21:16:59 UTC | Sent | K |
| 2022-01-23 21:18:33 UTC | Received | Here |
| 2022-01-23 21:25:49 UTC | Sent | Follow me red car |
| 2022-01-23 21:25:49 UTC | Sent | Did you see me |
| 2022-01-24 09:04:17 UTC | Sent | Did Doug even call to see if you guys needed those? |
| 2022-01-25 02:45:57 UTC | Received | He had a few hours after you served us |
| 2022-01-25 02:46:33 UTC | Received | Have u seen him tonight we're supposed to be meeting him at the firehouse for sum but now he's not answering |
| 2022-01-25 03:14:31 UTC | Sent | Are you there |
| 2022-01-25 03:15:36 UTC | Received | No but he said to come but now he won't pickup |

| | | |
|---|---|---|
| 2022-01-25 03:15:58 UTC | Sent | I'll meet you if he doesn't |
| 2022-01-25 03:17:23 UTC | Received | I don't think he's going to and that would be awesome but we only have 20 he said he was goona finnaly give us the 2 he owes us plus an extra |
| 2022-01-25 03:17:36 UTC | Received | Are u sure we only have 20 rounded up |
| 2022-01-25 03:18:03 UTC | Sent | Really. Let me try to get a hold of him. Yes because he's screwing up |
| 2022-01-25 03:19:30 UTC | Received | Okay sounds good just lmk |
| 2022-01-25 03:40:03 UTC | Received | Did you get ahold of him ? |
| 2022-01-25 03:45:29 UTC | Sent | Yeah he doesn't have any extra ones he doesn't have any of them he's full of beans |
| 2022-01-25 03:47:20 UTC | Received | Oh okay so he can't meet us |
| 2022-01-25 03:47:28 UTC | Sent | No |
| 2022-01-25 03:47:58 UTC | Received | Okay would you be able to or no |
| 2022-01-25 03:48:47 UTC | Sent | I can do yr two for 20 |
| 2022-01-25 03:49:48 UTC | Received | Okay we will do that then |
| 2022-01-25 03:49:52 UTC | Received | Firehouse? |
| 2022-01-25 03:49:58 UTC | Sent | Yes |
| 2022-01-25 03:50:44 UTC | Received | Okay again im sorry abt dougs problems I should be getting 100 dollars next week tho so I can actually give u business lol |
| 2022-01-25 03:50:48 UTC | Received | Okay im otw now |
| 2022-01-25 03:50:56 UTC | Sent | K |
| 2022-01-25 03:51:09 UTC | Sent | I have to go to bijou can you meet me over there |

| | | |
|---|---|---|
| 2022-01-25<br>03:51:14 UTC | Sent | There's convenience store |
| 2022-01-25<br>03:56:49 UTC | Received | What's the convenience store called |
| 2022-01-25<br>03:56:52 UTC | Received | Yes I can |
| 2022-01-25<br>03:57:35 UTC | Received | Just bijou at convenience store ? |
| 2022-01-25<br>03:57:41 UTC | Received | *st |
| 2022-01-25<br>03:57:47 UTC | Sent | Yup |
| 2022-01-25<br>03:58:40 UTC | Received | E bijou or just bijou ? |
| 2022-01-25<br>04:08:39 UTC | Sent | W |
| 2022-01-25<br>04:09:58 UTC | Received | Okay I'll be at west bijou in 10 mins |
| 2022-01-25<br>04:10:11 UTC | Sent | K |
| 2022-01-25<br>04:21:03 UTC | Received | I'm here at west bijou what is the store called |
| 2022-01-25<br>04:33:14 UTC | Received | Here |
| 2022-01-28<br>18:16:00 UTC | Received | Hey m,do you have Xanax for sell ? |
| 2022-01-28<br>22:09:20 UTC | Sent | I don't sorry |
| 2022-01-29<br>01:53:21 UTC | Received | Would You do 5 bls for 50 ? |
| 2022-01-29<br>03:15:43 UTC | Received | Lmk |
| 2022-01-29<br>03:50:00 UTC | Sent | Yes |
| 2022-01-29<br>03:58:53 UTC | Received | Alright when do you want to meet |
| 2022-01-29<br>03:59:50 UTC | Sent | Same spot fire house |

| 2022-01-29<br>04:02:20 UTC | Received | Be there in 30 |
|---|---|---|
| 2022-01-29<br>04:21:15 UTC | Received | 5 mins out |
| 2022-01-29<br>04:22:02 UTC | Sent | Doug's gonna run it for me |
| 2022-01-29<br>04:22:13 UTC | Received | Okay send him down |
| 2022-01-29<br>04:24:08 UTC | Received | I'm at that white truck |
| 2022-01-29<br>04:25:56 UTC | Sent | K |
| 2022-01-29<br>04:28:39 UTC | Sent | Sorry his slow |
| 2022-01-29<br>04:29:02 UTC | Received | It's fine is he coming now ? |
| 2022-01-29<br>04:42:42 UTC | Received | ? |
| 2022-01-29<br>04:46:54 UTC | Received | This you? |
| 2022-01-29<br>04:54:22 UTC | Sent | No him |
| 2022-01-30<br>00:42:59 UTC | Received | Do you know a way to get ahold of Doug ? |
| 2022-01-30<br>00:44:03 UTC | Sent | He's sleeping what's up he's sleeping what's up |
| 2022-01-30<br>00:45:20 UTC | Received | Just had talked to him abt the 2 he's goona give me and he just said he will see wussup I have 20 for him if he can give me one for free and I'll buy the other for 20 |
| 2022-01-30<br>00:45:26 UTC | Received | But his phone don't work so |
| 2022-01-30<br>00:46:39 UTC | Sent | I I can't say what he's up to but as soon as she wakes up I can let him know or if you want I'll take care of the two for 20 |
| 2022-01-30<br>00:58:11 UTC | Received | Whichever works |
| 2022-01-30<br>00:58:18 UTC | Received | Do u have a cashapp? |

| 2022-01-30<br>00:58:28 UTC | Received | I could send it to you on ? |
|---|---|---|
| 2022-01-30<br>01:53:23 UTC | Received | Or I got 20 cash but im trying to get another 20 in my cashapp for you so 40 total can u still meet |
| 2022-01-30<br>03:43:30 UTC | Received | Missed call from Cc'ed Kid |
| 2022-01-30<br>03:59:19 UTC | Received | You there? |
| 2022-01-30<br>07:01:07 UTC | Received | Hey m they were really good and possibly if I gave you 100 dollars in advanced would u be able to find/pickup bars like could you find them anywhere cuz I can't |
| 2022-01-30<br>08:51:59 UTC | Sent | I'll try |
| 2022-01-31<br>01:40:33 UTC | Received | Okay cool cool |
| 2022-01-31<br>01:41:07 UTC | Received | Do you think you or Doug could serve me 40 worth of bls rn ? |
| 2022-01-31<br>01:43:30 UTC | Sent | Yes |
| 2022-01-31<br>01:43:44 UTC | Received | Do you have a cashapp to ? |
| 2022-01-31<br>01:43:52 UTC | Sent | Yes |
| 2022-01-31<br>01:43:56 UTC | Received | Because I can buy 5 if you have one |
| 2022-01-31<br>01:43:59 UTC | Received | Okay cool |
| 2022-01-31<br>01:44:02 UTC | Sent | Yes |
| 2022-01-31<br>01:44:10 UTC | Sent | Mmcg69 |
| 2022-01-31<br>01:45:45 UTC | Received | Is this it |
| 2022-01-31<br>01:45:47 UTC | Received | https://media.textnow.com/?h=8312b5df-8237-11ec-ab33-da172bd1760f |
| 2022-01-31<br>01:46:03 UTC | Sent | Yup |

| 2022-01-31<br>01:46:11 UTC | Received | Otw to fire station now |
|---|---|---|
| 2022-01-31<br>01:46:27 UTC | Sent | K |
| 2022-01-31<br>01:59:23 UTC | Received | It's not letting me send it so ima just have to get 4 |
| 2022-01-31<br>01:59:31 UTC | Received | But I'll be there soon |
| 2022-01-31<br>02:04:32 UTC | Sent | K |
| 2022-01-31<br>02:14:48 UTC | Received | Pulling up |
| 2022-01-31<br>02:24:53 UTC | Sent | K |
| 2022-01-31<br>02:32:34 UTC | Sent | Omw |

These messages show repeated deals between McGuire and Juvenile #1 for blue pills. They also show Floyd and McGuire worked together to sell Juvenile #1 and his friends pills.

*Analysis of Phone Location Information*

Investigators obtained historical location information for Floyd's phone with a search warrant. Based on the information they received, it appears the defendant's phone was not present at the fire station at the time Juvenile #1, Juvenile #2, and Juvenile #3 went there on the evening of January 30, 2022.

Investigators also obtained historical location information for McGuire's phone with a search warrant. Based on the information they received, it appears McGuire's phone was in the area of both her residence and the fire station on Bradley Circle from about 7:00 p.m. to 7:36 p.m. At about 7:36 p.m., the device moved north and then left the area. This information, particularly in light of the TextNow messages, tends to

Page 25 of 29

establish McGuire was the person who met with the boys at the fire station on January 30, 2022.

## VI.   ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the government may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

a)   Under USSG §2D1.2(a)(3), the base offense level is **26** because the offense involved a person less than eighteen years of age.

b)   There are no victim-related, role-in-offense, grouping, and/or multiple-count adjustments.

c)   The government intends to argue the defendant should receive a **2-level increase** pursuant to USSG §3B1.3 because she abused a position of private trust in a manner that significantly facilitated the commission of the offense. The defendant opposes this increase.

Page 26 of 29

d)      The total offense level, according to the government's calculation, is **28**. The total offense level, according to the government's calculation, is **26**.

e)      Because the defendant clearly demonstrates acceptance of responsibility for her offense, she should receive a **2-level decrease** pursuant to Section 3E1.1(a). Because the defendant has assisted authorities in the investigation or prosecution of her own misconduct by timely notifying authorities of her intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, the government intends to file a motion recommending the court grant her an additional **1-level decrease** pursuant to Section 3E1.1(b).

f)      The resulting total offense level, according to the government's calculation, is **25**. The resulting total offense level, according to the government's calculation, is **23**.

g)      The parties understand the defendant's criminal history computation is tentative and based on the defendant's prior convictions. The parties believe the defendant is in criminal history category **VI**.

h)      The career offender/criminal livelihood/armed career criminal adjustments do not apply.

i)      The advisory guideline range, according to the government's calculation (TOL 25, CHC VI), is **110 - 120 months**. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level estimated above could conceivably result in a range from 57 months (bottom of Criminal History Category I) to 115 months (statutory maximum permitted by 21 U.S.C. § 859).

j)      The advisory guideline range, according to the defendant's calculation (TOL 23, CHC VI), is **92 - 115 months**. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level estimated above could conceivably result in a range from 46 months (bottom of Criminal History Category I) to 115 months (top of Criminal History Category VI).

k)      The guideline range would not exceed, in any case, the statutory maximum applicable to the count of conviction.

l) Pursuant to guideline §5E1.2 and 21 U.S.C. §§ 841(b)(2) and 859, the fine range for this offense would be **$20,000 - $500,000**, plus applicable interest and penalties.

m) Pursuant to guideline §5D1.2 and 21 U.S.C. § 841(b)(2) and 859, if the Court imposes a term of supervised release, that term is **at least two years, but not more than three years**.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII. ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor

//

//

//

the defendant has relied, or is relying, on any other terms, promises, conditions or

assurances.

Date: _____     Maria Davis-Conchie
                        Defendant

Date: 8/9/43            _____
                        John F. Sullivan, III
                        Attorney for Defendant

Date: 08/15/2023        _____
                        Peter McNeilly  Aly Mance
                        Assistant U.S. Attorney